# In the United States Court of Federal Claims

No. 15-1473C

(Filed:  September 28, 2016)

<table>
<tr><td>

_____

**BAISTAR MECHANICAL, INC.,**

          **Plaintiff,**

      **v.**

**UNITED STATES,**

          **Defendant.**

_____

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

Contract dispute; express contractual limitations on the authority of the contracting officer's technical representatives to bind the government; claims for equitable adjustments; no jurisdiction over *quantum meruit* claim; the emergency exception regarding authority to bind the government to contract; duty to cooperate

</td></tr>
</table>

    Joshua G. Whitaker, Adelphi LLP, Baltimore, Maryland, for plaintiff.

    Douglas T. Hoffman, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, and Robert E. Kirschman, Jr., Director, Donald E. Kinner, Assistant Director, and Scott D. Austin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington D.C.  With Mr. Hoffman at the hearing was Kyle Hearns, Bureau of the Fiscal Service.

## OPINION AND ORDER

LETTOW, Judge.

    This case arises from a contract dispute between Baistar Mechanical, Inc. ("Baistar") and the United States ("the government"), acting through the Bureau of the Fiscal Service ("Fiscal Service"), for the Armed Forces Retirement Home ("Retirement Home").  The Fiscal Service, a component of the U.S. Department of the Treasury, provides procurement services to the Retirement Home on a reimbursable basis.  *See* Def.'s Mot. to Dismiss and Mot. for Summary Judgment ("Def.'s Mot.") at 3, ECF No. 10.  The Retirement Home, an independent agency within the Executive Branch, serves certain former and retired members of the military.  *Id.*  In 2010, Baistar successfully bid on and was awarded the Retirement Home's Ground Maintenance and Snow Removal Services Contract ("the ground maintenance contract").  Compl. ¶ 20.  The contract was executed in December 2011, and contemplated a five-year period of performance beginning on December 16, 2011.  Compl. ¶ 20; *see also* Def.'s Mot. App. ("Def.'s App."), at

A1-50 (Contract).[1]  The contract was cut short, however, in July 2015, when it was terminated by the Fiscal Service's contracting officer.  Compl. ¶ 66.

The complaint states eight separate counts as grounds for relief.  Baistar alleges that the government failed to properly compensate Baistar for services it performed outside the scope of the contract, as well as certain services it performed within the contract, between 2010 and 2015 (Counts I, III, IV, V).  Additionally, Baistar alleges that the government impeded its performance by improperly preventing Baistar from storing necessary equipment on-site and by failing to order services identified in the contract (Counts VI, VIII).  Finally, Baistar alleges that the government improperly terminated the contract in 2015 (Count VII).[2]  As a result, Baistar requests equitable adjustments to the contract.  *See* Compl.  In response, the government answered the complaint, contending that Baistar is not entitled to compensation for any of its claims and that the contract termination was proper.  *See generally* Answer, ECF No. 7.

Pending before the court is the government's motion to dismiss plaintiff's complaint or, alternatively, for summary judgment, pursuant to Rules 12(b)(6) and 56 of the Rules of the United States Court of Federal Claims ("RCFC").  The motions have been briefed and were addressed at a hearing on August 18, 2016.

## BACKGROUND

Baistar provides services to the government that include engineering, facilities management, maintenance, and construction.  Compl. ¶ 6.  On December 16, 2011, the Fiscal Service awarded Baistar the ground maintenance contract for the Retirement Home's property in Washington, D.C.  Compl. ¶¶ 5, 20, 21.  The 270-acre property provides residence and related services to several hundred retired members of the military.  Compl. ¶ 5.  The contract outlined a potential five-year period of performance, with a renewable option at the end of each year.  Compl. ¶ 20.  Baistar has worked at and with the Retirement Home since 2007 through a total of approximately 24 contracts.  *See* Compl. ¶ 7; Def.'s Mot. at 3.

Baistar alleges that disputes arose throughout the contractual period until the contract was terminated by the Retirement Home in 2015.  Most of the disputes centered on directions Baistar received from the contracting officer's representatives who were on-site.  Several contracting officers were involved in administering the contract, each of whom was located at the Fiscal Service's office in Parkersburg, West Virginia.  *See* Compl. ¶ 26, Def.'s App. A72, A88.  The specific topics and elements in dispute are addressed by the separate counts stated in the complaint.

_____

[1]The appendix to the government's motion consists of the contract and 27 additional documents relating to Baistar's performance, tallying 167 sequentially numbered pages.  The appendix will be cited as "Def.'s App. A___," showing the pertinent page number.

[2]At the hearing held on August 18, 2016, Baistar's counsel conceded that Count II can be dismissed by agreement.  Hr'g Tr. 35:7-9 (Aug. 18, 2016).  That count alleged that the Fiscal Service had arranged for another contractor to perform services that the contract provided would be performed by Baistar.  In actuality, the services at issue were performed on a volunteer basis.  Def.'s Mot. at 12-13.

*A.   Items in Dispute*

*1.   Count I.*

In Count I, Baistar alleges that it performed certain services regarding the boiler plants and hiking trail at the Retirement Home, but without compensation.  Compl. ¶¶ 73-87.  In November 2010, Baistar alleges that two of the contracting officer's representatives requested assistance from Baistar for the planning and design of the current boiler plant and future plants at the Retirement Home.  Compl. ¶¶ 75, 77, 79.  Despite Baistar's alleged planning efforts and ongoing communications with the contracting officer's representatives in 2011 and 2012, Baistar was not selected as the contractor for the plant projects.  Compl. ¶¶ 77-79.  Baistar alleges that its design and feasibility study efforts allowed the Retirement Home to avoid paying for those activities and caused that work not to be required of the later-hired contractor that was ultimately selected.  Compl. ¶ 77.  As a result, Baistar seeks $65,600 in damages for uncompensated services.  Compl. ¶ 86.

Additionally, Baistar seeks an equitable adjustment for services it allegedly performed related to the Retirement Home's hiking trail.  Baistar alleges that in August 2012, a contracting officer's representative requested a proposal from Baistar to convert the hiking trail on the premises into a gravel trail.  Compl. ¶ 80.  Baistar submitted a proposal to the contracting officer as requested, but did not receive a response and was not selected for the project.  Compl. ¶¶ 81-83.  Baistar alleges that the Retirement Home and the contractor ultimately hired for the hiking trail relied on Baistar's proposal and designs in completing the project.  Compl. ¶ 83.  As a result, Baistar claims $3,050 in uncompensated services.  Compl. ¶ 86.

*2.   Count III.*

As described, Baistar was not selected as the contractor for the hiking trail project.  Compl. ¶ 83.  Subsequently, however, Baistar alleges that a contracting officer's representative directed Baistar to repair part of the hiking trail after the contractor that had been retained improperly compacted the gravel.  Compl. ¶ 100.  Baistar alleges that it provided $5,232 in uncompensated services in May 2013 and submitted an invoice, but the invoice was rejected.  Compl. ¶¶ 101, 105.

*3.   Count IV.*

As part of its contract with the Retirement Home, Baistar was obligated to maintain the Retirement Home's "Historic Canal."  Compl. ¶ 107.  Baistar alleges that it provided certain services related to the canal, which were outside the scope of the ground maintenance contract, without receiving compensation.  Compl. ¶¶ 106-22.

First, Baistar alleges that it was directed to perform tree and stump removal services outside the scope of the contract.  The contract between Baistar and the Retirement Home required Baistar to remove debris and vegetation from the canal, but it did not address tree or stump removal.  Compl. ¶ 107.  Upon finding problematic trees and stumps that needed removal in July 2013, Baistar informed the contracting officer and representative.  Compl. ¶¶ 108-10.

3

The contracting officer at the time requested that the trees and stumps be removed. Compl. ¶ 109. Before removal, however, Baistar was directed by the representative to provide an arborist's report; the contracting officer also requested such a report. Compl. ¶¶ 109-10, Ex. 55. Baistar allegedly provided the requested report in November 2013 to a contracting officer's representative, but did not initially receive a response. Compl. ¶ 111. In March 2014, however, Baistar alleges the contracting officer approved the tree and stump removal verbally and by e-mail. Compl. ¶ 115. Baistar alleges that Retirement Home staff were "actively aware" of and directly supervised Baistar's removal of the trees and stumps. Compl. ¶ 116. The government responds that the approval via e-mail in March 2014 related only to a cure notice the contracting officer issued in February 2014, not Baistar's proposal regarding the additional tree and stump removal work. *See* Def.'s Mot. at 15-16. Thereafter, Baistar's principal sent an e-mail in which he stated that he initially "interpreted [the contracting officer's] e-mail as if it referred to the proposed [tree and stump removal] work dated 11-6-2013," but then admitted that the e-mail "only referred to . . . the cure notice." *Id.* at 16. Baistar submitted an invoice for the completed stump removal work on September 30, 2014, but it was rejected. Compl. ¶ 117. Baistar claims $17,840 in damages for uncompensated services. Compl. ¶ 121.

Second, Baistar alleges that it was directed to perform certain brick repairs at the canal, which were outside the scope of the contract and uncompensated. The contract directed Baistar to reposition bricks and stones at the canal as necessary, but did not address brick repair. Compl. ¶ 107. The contracting officer explicitly indicated in a July 2013 e-mail that she did not want Baistar repairing any bricks. Compl. Ex. 55. Baistar included a proposal to repair the walls of the canal in a report dated November 2013, but it did not initially receive a response from the contracting officer. Compl. ¶¶ 112-13. Similar to the tree and stump removal claim, Baistar alleges that the contracting officer approved the proposal both verbally and through an e-mail in March 2014. Compl. ¶ 115. The government again responds by arguing that the March approval via e-mail only related to the Cure Notice issued in February, noting that Baistar's principal admitted as much in an e-mail. *See* Def.'s Mot. at 15-16. Baistar submitted an invoice on September 30, 2014, but the contracting officer rejected it. Compl. ¶ 117. Baistar alleges $4,390 in uncompensated services. Compl. ¶ 121.

### 4. *Count V.*

Under the contract, Baistar was required to provide snow pre-treatment, snow and ice removal, and ice prevention services at the Retirement Home. Compl. ¶ 126. Baistar alleges that it performed certain snow-related services outside the scope of the contract, as well as within the scope of the contract, without adequate compensation. First, Baistar alleges that the contracting officer's representatives directed Baistar to provide significant snow removal services in areas outside the scope of the contract. Compl. ¶¶ 129-34. Baistar further alleges that the contracting officers effectively authorized the work because they were copied on the e-mail orders from the representatives, but took no affirmative steps to stop Baistar from performing the alleged out-of-scope work. Compl. ¶¶ 131-32.[3] Baistar alleges $163,881.93 in damages for uncompensated services. Compl. ¶ 148.

---

[3]The government does not concede that such services were outside the scope of the contract. *See* Def.'s Mot. at 23 n.9.

Second, Baistar alleges that the contracting officer repeatedly did not allow Baistar to submit invoices for certain snow-related services Baistar provided, and did not pay other invoices in full.  Compl. ¶ 135.  Baistar concedes that it agreed to the contracting officer's demands and accepted the reduced payments.  Compl. ¶ 135.  Baistar alleges $22,840 in damages for uncompensated invoices.  Compl. ¶ 149.

Third, Baistar alleges that the contracting officer reduced the amounts of salt provided by Baistar on its invoices and rejected salt usage and treatment invoices submitted by Baistar.  Compl. ¶¶ 136-42.  Baistar alleges $44,200.80 in damages for uncompensated salt materials and services.  Compl. ¶ 149.

    *5.  Count VI.*

Between December 2011 and October 2014, Baistar used an equipment storage area on the Retirement Home premises to store its "contract performance items."  Compl. ¶¶ 156-57.  Baistar alleges that on-site storage was discussed during the contract proposal period, before the governing contract was executed; at that time, contracting officer's representatives allegedly told Baistar that it would have access to an equipment storage area during the contract period.  Compl. ¶ 156.  The prior incumbent contractor had reportedly used the same area, which could be secured, and Baistar then used the area for the first years of its contract performance.  Compl. ¶¶ 156-57.  In October 2014, however, the Fiscal Service informed Baistar that it could no longer use the area for storing equipment.  Compl. ¶ 157.  As a result, Baistar had to transport its equipment to the Retirement Home daily, resulting in alleged additional costs of $10,401.89.  Compl. ¶¶ 158, 163.

In addition to relying on the representations of the contracting officer's representatives, Baistar alleges that it relied on the explicit terms of the contract.  The contract stated that Baistar would "be allowed to store [s]alt, [s]and, and other snow removal and [i]ce treatment materials in a designated area determined by [the Retirement Home]."  Compl. ¶ 153.  The contract also stated that Baistar would remove its equipment and materials upon termination of the contract.  Compl. ¶ 154.

The government responds that the contract does not provide an allowance for equipment storage or equipment transportation costs.  *See* Def.'s Mot. at 16-19.  To support its position, the government points to a specific provision in the contract that states "[t]he [g]overnment will not provide facilities and the [c]ontractor shall not place, construct, or otherwise provide additional buildings or facilities at the [Retirement Home] without prior written approval."  *Id.* at 17.  The contract detailed a fixed monthly payment to Baistar for its services without any additional reference to equipment, and also noted that the contractor would provide transportation and equipment.  *Id.* at 16-17.

    *6.  Count VII.*

On June 18, 2015, the contracting officer issued a Cure Notice based on Baistar's failure to adequately maintain the Retirement Home grounds, green roofs, historic canal, flower beds, irrigation system, and trees, as required by the contract.  Compl. ¶¶ 57, 165, Ex. 4.  Baistar

responded on June 26, 2015, with a detailed letter requesting clarification and further specifics on the deficient areas. Compl. ¶¶ 60, 170, Ex. 5. The contracting officer did not respond to that letter. Instead, the officer issued a "Stop-Work Order" on July 6, 2015 after receiving a "profanity-laced" e-mail from Baistar's principal. *See* Compl. ¶ 173, Ex. 6; Def.'s Mot. at 34. On July 10, 2015, the contracting officer terminated the contract for default. Compl. ¶ 178. As a result of the contracting officer's allegedly improper actions in terminating the contract, Baistar requests damages. Compl. ¶¶ 180-81.

### 7. *Count VIII.*

In its final count, Baistar alleges that the Retirement Home consistently refused to order certain services falling within the contract, including emergency, special events, tree removal, and hardscaping services. Compl. ¶¶ 182-98. Baistar alleges that such refusals were not done for a legitimate business purpose, but rather to harm Baistar. Compl. ¶¶ 182-98. As a result, Baistar requests $40,000 for lost profits and unrecovered labor costs, and $300,000 for loss of business expectation. Compl. ¶ 198.

In response, the government contends that the contract did not require the Retirement Home to order minimum amounts of services. *See* Def.'s Mot. at 19-23. Although the contract required Baistar to provide emergency services "[u]pon notification of an emergency" and set forth the price Baistar would be paid if such services were provided, it did not obligate the Retirement Home to order any emergency services from Baistar. *Id.* at 19-20. Similar provisions were set forth for special events, tree removal, and hardscaping. *Id.* at 20-23.

## B. *Contracting Authority*

The contract reserved contracting authority exclusively to the contracting officer. Specifically, the contract provided:

> Any additional services or a change to work specified which may be performed by the contractor, either at its own volition or at the request of an individual other than a duly appointed [contracting officer], except as may be explicitly authorized in the contract, will be done at the financial risk of the contractor. *Only a duly appointed [contracting officer] is authorized to bind the [g]overnment to a change in the specifications, terms, or conditions of this contract.*

Def.'s App. A46 (Performance Work Statement ("PWS") ¶ 28) (emphasis added). Furthermore, the contract explicitly stated that the contracting officer's representatives did "not have authority to issue technical direction that . . . [c]hanges any of the terms, conditions or specification(s)/work statement of the contract." Def.'s App. A16 (incorporating and quoting DTAR § 1052.201-70(c)).[4] If a representative did provide technical direction that Baistar believed to be outside of the representative's authority, Baistar was required to "proceed promptly with performance" and then "immediately notify the contracting officer no later than the beginning of the next [g]overnment work day." *Id.* (DTAR § 1052.201-70(e)).

---

[4]"DTAR" is the acronym for Department of the Treasury Acquisition Regulations.

### C. Baistar's Requests for Equitable Adjustments

Baistar submitted requests for equitable adjustments regarding the alleged services it provided in Counts I-VI above, but the contracting officer denied all the requests in 2015. Compl. ¶¶ 72, 74, 89, 95, 107, 124, 152; Def.'s Mot. at 6-7.  Baistar then filed suit in this court on December 4, 2015 to recover equitable adjustments for the work Baistar allegedly performed. *See* Compl.  The government responded with an answer and then its motion to dismiss plaintiff's complaint or, alternatively, for summary judgment, which is now pending before the court.  *See* Def.'s Mot.

## JURISDICTION

The Tucker Act provides this court with jurisdiction over "any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1).  Under the Tucker Act, this court more specifically has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract." 28 U.S.C. § 1491(a)(2).  The recodified Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101-7109, sets forth procedures a contractor must follow to pursue a claim against the federal government.  So long as those procedures are followed, a contractor may bring a claim in the United States Court of Federal Claims "in lieu of appealing the decision of a contracting officer . . . to an agency board." 41 U.S.C. § 7104(b)(1).

To comply with the CDA, "the contractor must submit a proper claim" and "must have received the contracting officer's final decision on that claim." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1328 (Fed. Cir. 2010).  A claim is "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48 C.F.R. § 2.101; *see H.L. Smith, Inc. v. Dalton*, 49 F.3d 1563, 1564-65 (Fed. Cir. 1995) (holding that this definition of "claim" governs in CDA actions).  The contractor must file its claim with the contracting officer within six years of accrual and certify claims seeking more than $100,000. 41 U.S.C. §§ 7103(a), (b).  Once a claim is submitted, the contracting officer must issue a decision within 60 days or, for claims over $100,000, notify the contractor within 60 days of when a decision will be issued. 41 U.S.C. § 7103(f).  After a final decision is issued, the contractor may challenge a contracting officer's decision by filing a complaint in this court within twelve months. 41 U.S.C. § 7104(b)(1), (3).

Between June and August 2015, Baistar complied with the CDA by submitting written requests to the contracting officer for equitable adjustments under Counts I-VI above.  Compl. ¶¶ 72, 74, 89, 95, 107, 124, 152; se*e also* Def.'s Mot. at 6-7.  After the contracting officer issued final decisions rejecting each of these requests between August and November 2015, *see, e.g.*, Def.'s App. A96-97, A98-99, A100-01, A102-03, A104-06, Baistar filed suit in this court in December 2015, well within the twelve-month limitation period.  Thus, the court has jurisdiction over Baistar's claims.

The government nonetheless argues that Baistar's allegations, if accepted as true, would divest the court of jurisdiction. *See* Def.'s Reply to Pl.'s Opp'n ("Def.'s Reply") at 18-19, ECF No. 12.  Among other things, Baistar contends that the contracting officer denied Baistar's equitable adjustment requests improperly, on the ground that the officer lacked "personal knowledge and independent decision making."  *See* Pl.'s Opp'n to Def.'s Mot. ("Pl.'s Opp'n") at 17, ECF No. 11.  The government asserts that a proper final decision from the government is a prerequisite for jurisdiction under the CDA, and if the contracting officer did in fact deny Baistar's requests improperly, as Baistar alleges, then there would be no final decision from a contracting officer and the court would lack jurisdiction over Baistar's claims.  *See* Def.'s Reply at 18-19; *see also* 41 U.S.C. §§ 7103, 7104(b)(3); *Buse Timber & Sales, Inc. v. United States,* 45 Fed. Cl. 258, 265 (1999).

This ancillary jurisdictional contention by the government regarding the CDA is sophistic and unavailing.  When a contracting officer fails to issue a final decision within the allotted time under the CDA, the contractor's claim is "deemed" denied and the contractor is permitted to seek relief in this court.  41 U.S.C. § 7103(f)(5); s*ee United Partition Sys., Inc. v. United States*, 59 Fed. Cl. 627, 634-35 (2004) (citing *Case, Inc. v. United States,* 88 F.3d 1004, 1008-09 (Fed. Cir. 1996); *Southern Cal. Edison v. United States,* 58 Fed. Cl. 313, 320 (2003); *Claude E. Atkins Enters. v. United States,* 27 Fed. Cl. 142, 143-44 (1992)).  For example, in *United Partition*, the court found the contracting officer's final decision to be improper because the decision exceeded the officer's scope of authority under the Federal Acquisition Regulations.  59 Fed. Cl. at 636-39.  The contractor's claim nonetheless had been properly filed.  As a result, the court treated the final decision as a "legal nullity" that did not affect the "contractor's rights or obligations" and proceeded "as if the [decision] never occurred."  *Id.* at 637.  Because the decision was treated as if it did not occur, plaintiff's claims were deemed denied 60 days after the government received them.  *See id.* at 637, 639-40.  Thereafter, plaintiff had filed a timely complaint following that 60-day period, and consequently the court had jurisdiction.  *See id.* at 639-40 (noting that the contracting officer's erroneous decision "cannot be held against [plaintiff]").

Here, similarly, the validity of the contracting officer's final decision is at issue.  But even assuming Baistar is correct and the officer's decision was improper, the court would still have jurisdiction.  Under the framework of the CDA, as *United Partition* holds, an improper decision would simply be treated as a legal nullity, resulting in no decision at all.  Baistar's claims were properly submitted, and the officer's failure to respond appropriately would be deemed a denial 60 days after receipt of those claims.  *See* 41 U.S.C. § 7103(f)(5); *United Partition,* 59 Fed. Cl. at 637, 639-40.  Because Baistar filed suit in December 2015, more than 60 days after the contracting officer received Baistar's requests for equitable adjustment, the court has jurisdiction over Baistar's claims.

## STANDARDS FOR DECISION

### A.  Rule 12(b)(6)

When ruling on a motion to dismiss under RCFC 12(b)(6), the court must examine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To avoid dismissal, the facts alleged "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Kam-Almaz v. United States*, 682 F.3d 1364, 1367-68 (Fed. Cir. 2012) (quoting *Twombly,* 550 U.S. at 555).

Additionally, the court is required to accept all factual allegations in the complaint as true, and to draw "all reasonable inferences" in favor of the non-moving party.  *Stanwyck v. United States*, 127 Fed. Cl. 308, 311-12 (2016) (citations omitted); *Bowers Inv. Co., LLC v. United States*, 104 Fed. Cl. 246, 253 (2011) (quoting *Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed. Cir. 2001)), *aff'd*, 695 F.3d 1380 (Fed. Cir. 2012).  The court is not, however, required to accept mere legal conclusions, even when placed within factual allegations.  *See Rack Room Shoes v. United States*, 718 F.3d 1370, 1376 (Fed. Cir. 2013) (citing *Iqbal*, 556 U.S. at 678); *Kam-Almaz*, 682 F.3d at 1367-68 (citing *Twombly*, 550 U.S. at 555).

Although the complaint "does not need detailed factual allegations," *Twombly,* 550 U.S. at 555, it nonetheless must present more than "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 557) (alteration in original).  Thus, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss."  *Howell v. United States*, __ Fed. Cl. __, __, No. 16-316C, 2016 WL 4423917, at *14 (Fed. Cl. Aug. 15, 2016) (citing *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir. 1981), *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998)).

### B.   Rule 56

A grant of summary judgment is proper when the pleadings, affidavits, and evidentiary materials of the case demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-49 (1986).  There is a genuine dispute when the issue "may reasonably be resolved in favor of either party."  *Id.* at 250.  A fact is considered material when it "might affect the outcome of the suit under the governing law."  *Id.* at 248.

The moving party has the burden of establishing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  Therefore, the court is to draw all factual inferences "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)).  Summary judgment will be appropriate if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id*. at 587.

### ANALYSIS

### A.   The Court Lacks Jurisdiction over Baistar's Quantum Meruit *Claim*

Baistar argues that it is entitled to recover on a "*quantum meruit* basis for the value of the goods or services received by the government" because Baistar conferred a benefit to the Retirement Home by providing services outside the scope of the contract.  Pl.'s Opp'n at 9.  *Quantum meruit* presents an implied-in-law claim, which this court generally has no

jurisdictional power to hear.  *See International Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007); *Atlas Corp. v. United States*, 895 F.2d 745, 755 (Fed. Cir. 1990); s*ee also Trauma Serv. Grp., Ltd. v. United States*, 33 Fed. Cl. 426, 432 (1995) ("Claims for unjust enrichment on *quantum mer[u]it* damages state claims for breaches of contracts implied in law, over which the court has no jurisdiction.") (citations omitted), *aff'd sub nom. Trauma Serv. Grp. v. United States*, 104 F.3d 1321 (Fed. Cir. 1997).

An exception to the general rule exists only when a contractor in good faith provides goods or services to the government under an express contract that is later rescinded due to invalidity.  *See United States v. Amdahl Corp.*, 786 F.2d 387, 393 (Fed. Cir. 1986).  This limited exception does not apply here because the contract's validity is not disputed.  Therefore, the court does not have jurisdiction over Baistar's *quantum meruit* claim.

### B. Count I: The Court Requests a More Definitive Statement, Pursuant to Rule 12(e), Regarding Baistar's Claims Regarding Alleged Boiler Plant Services

Baistar's claimed entitlement to an equitable adjustment for the boiler plant services, based on implied-in-fact contract, constructive change, and direct breach of contract theories, *see* Pl.'s Opp'n at 9-11, cannot and does not turn on the terms of the ground maintenance contract primarily at issue here.  Baistar had been working with the Retirement Home since 2007 through a total of approximately 24 contracts.  *See* Compl. ¶ 7; Def.'s Mot. at 3.  Most significantly, Baistar alleges that some of these other contracts with the Retirement Home included services related to the boiler plant.  *See* Compl. ¶¶ 7, 12; Hr'g Tr. 33:24-35:5 (Aug. 18, 2016).  The terms of those contracts have not been specified.  The government's motion to dismiss this count focuses solely on the terms of the ground maintenance contract, *see* Def.'s Mot. at 10, and consequently is not particularly helpful to evaluating Baistar's allegations.  In this circumstance, the court requests a more definite statement from Baistar, pursuant to RCFC 12(e), regarding whether Baistar's boiler plant services fell within one or more of the other then-existing contracts between Baistar and the Fiscal Service regarding the Retirement Home.

### C. Counts I, III, and IV: Baistar Is Not Entitled to Recover for Ground Maintenance Services Provided Outside the Scope of the Contract, Including Services Related to the Hiking Trail, Tree and Stump Removal, and the Historic Canal, Because the Services Were Not Ordered by a Government Agent with Authority to Bind the Government

To bring a viable claim for an equitable adjustment, a plaintiff must prove three elements: "liability, causation, and resultant injury."  *Servidone Constr. Corp. v. United States,* 931 F.2d 860, 861 (Fed. Cir. 1991).  Baistar contends that the government should be liable for the services Baistar provided outside the scope of the ground maintenance contract, relying on implied-in-fact contract, constructive change, and direct breach of contract theories.  *See* Pl.'s Opp'n at 9-11.  The government responds that that no breach of contract or constructive change occurred because Baistar was not directed to perform the work by any government agent with authority to bind the government.  *See* Def.'s Reply at 4-7.

### 1. The implied-in-fact theory.

An implied-in-fact contract is premised on a meeting of the minds, which can be inferred from the conduct of the parties and the surrounding circumstances. *Night Vision Corp. v. United States*, 469 F.3d 1369, 1375 (Fed. Cir. 2006). To establish a valid contract with the government, a plaintiff must demonstrate "(1) mutuality of intent; (2) consideration; (3) lack of ambiguity in the offer and acceptance; and (4) actual authority to bind the government in contract on the part of the government official whose conduct is relied upon." *Vargas v. United States*, 114 Fed. Cl. 226, 233 (2014); *see also Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997) ("The requirements for a valid contract with the United States are: a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract."). These requirements are the same for express and implied contracts. *Trauma Serv. Grp.*, 104 F.3d at 1325.

A government agent can bind the government if the agent possesses express or implied actual authority. *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed. Cir. 1989). Actual authority is implied when such authority is an "integral part of the duties assigned" to the particular government agent. *Id.* (quoting Ralph C. Nash, Jr. & John Cibinic, Jr., *Formation of Government Contracts* 43 (1982)). Authority will not be considered integral, and no implied authority will exist, when the action taken by the government agent contravenes the explicit terms of the governing contract. *See Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1346 (Fed. Cir. 2007) (holding that a government agent did not have implicit authority to modify the contract because the contract itself and an incorporated government regulation "explicitly state[d] that only the contracting officer had the authority to modify the contract"); *P & K Contracting, Inc. v. United States*, 108 Fed. Cl. 380, 391 (2012) (holding that a contracting officer's representative did not have implicit authority to modify the contractor's scope of work because the contract exclusively reserved that authority to the contracting officer), *aff'd*, 534 Fed. Appx. 1000 (Fed. Cir. 2013); *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 374 (2004) (noting that implied actual authority to create a contract does not exist when "express provisions limit the ability of an individual to enter into a particular type of contract or arrangement") (citations omitted).

Actual authority can be express or implied, but apparent authority is insufficient. *H. Landau & Co.*, 886 F.2d at 324; s*ee also Liberty Ammunition, Inc. v. United States*, __ F.3d __, __, 2016 WL 4488151, at *9-10 (Fed. Cir. Aug. 26, 2016) (noting that while apparent authority can generally bind a principal in a private transaction, "the government is immune to actions of its agents who merely possess apparent authority"). A government agent's mere appearance of authority alone will not provide that agent with the requisite authority to bind the government. *See Miller Elevator Co. v. United States,* 30 Fed. Cl. 662, 678 (1994).

When a contractor works with or enters into an agreement with a government agent, the contractor is responsible for determining whether that agent can effectively bind the government. *See City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) ("[A]nyone entering into an arrangement with the [g]overnment takes the risk of having accurately ascertained that he who purports to act for the [g]overnment stays within the bounds of his authority") (citing *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384 (1947)); *Advanced Team Concepts, Inc. v. United States*, 68 Fed. Cl. 147, 150 (2005) ("[A] person contracting with the federal government

bears the burden of ascertaining that the agent is acting within the scope of her authority and duty"), *clarified*, 77 Fed. Cl. 111 (2007); *see also Trauma Serv. Grp.*, 104 F.3d at 1325 ("[T]his risk remains with the contractor even when the [g]overnment agents themselves may have been unaware of the limitations on their authority.").

Here, Baistar has failed to sufficiently allege a valid implied-in-fact contract.  Even under an implied contract theory, Baistar needed to allege that a government agent with actual authority directed Baistar to perform the out-of-scope services.  Rather than doing so, Baistar alleges that the contracting officer's representatives ordered the services.[5]  The express provisions of the ground maintenance contract grant exclusive authority to the contracting officer, not the representatives, to make any changes regarding scope of work.  Def.'s App. A46, ¶ 28 ("Only a duly appointed C[ontracting ]O[fficer] is authorized to bind the [g]overnment to a change in the specifications, terms or conditions of this contract.").  Thus, the contracting officer's representatives lacked express authority to bind the government.

Moreover, the contract terms and relevant regulation prevent Baistar from claiming implied actual authority.  Even assuming that the representatives almost exclusively managed the contract, as Baistar alleges, they did not possess implied authority to order out-of-scope work.  *See* Def.'s App. A16 ("The C[ontracting ]O[fficer's ]T[echnical ]R[epresentative] does not have authority to issue technical direction that . . . [c]hanges any of the terms, conditions, or specification(s)/work statement of the contract." (quoting DTAR § 1052.201-70(c))).  Factually, this case is somewhat similar to *Winter v. Cath-dr/Balti Joint Venture*, where the contracting officer delegated certain authority to the representative, but the representative still lacked implied authority to modify the contract because the contract only authorized the contracting officer to do so.  497 F.3d at 1344-46.  Similarly, the Fiscal Service's contracting officer may have delegated management authority to its representatives, but that delegation was limited by the contract.  The contract's explicit terms gave the contracting officer exclusive authority to order out-of-scope work, and barred the representatives from implied authority to do the same.  The fact that the representatives allegedly acted as if they had authority to direct work, or even believed they had authority, is insufficient.  Baistar makes no claim that any of the out-of-scope work covered by Counts I, III, and IV involved emergencies or exigent circumstances.  If they had, a different set of contractual provisions may have required Baistar to do the work and then authorized and required the government to pay for the work.  *See infra*, at 14-15.

### 2. The constructive change theory.

When a contractor is directed to perform additional work outside the scope of the relevant contract, but is not directed to do so by a formal order, the contractor's claim for equitable adjustment can be analyzed under the constructive change doctrine.  "Where it requires a

---

[5]Baistar does also allege that the services provided under Count IV were ultimately approved by a contracting officer.  However, this contention is not persuasive because Baistar's own principal conceded, prior to this litigation, that the contracting officer's approving e-mail only related to a recent proposal from Baistar regarding a cure notice, not Baistar's proposed work sent several months earlier.  *See* Compl. ¶ 115; Def.'s Mot. at 15-16.

constructive change in a contract, the [g]overnment must fairly compensate the contractor for the costs of the change." *Aydin Corp. v. Widnall,* 61 F.3d 1571, 1577 (Fed. Cir. 1995).

To establish a constructive change, a plaintiff must show that (1) it performed work outside the scope of the contract, and (2) it performed the work as a result of an informal government order, either express or implied, or due to the fault of the government. *International Data Prods. Corp.*, 492 F.3d at 1325; *Redland Co. v. United States*, 97 Fed. Cl. 736, 755-56 (2011) (citing *Miller Elevator*, 30 Fed. Cl. at 678). When the change to the contract creates materially different work for the contractor, it is a cardinal change that results in a breach of contract. *See Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014).

Additionally, as with an implied-in-fact contract, the government agent directing the change must possess actual authority to bind the government. *See Bell/Heery*, 739 F.3d at 1335 (noting that in analyzing a constructive change claim, the court must first determine whether the government agent ordering the work had the authority to do so); *Winter*, 497 F.3d at 1344 ("To demonstrate entitlement to an equitable adjustment, [plaintiff] must prove that the contract was modified by someone with actual authority."); *Miller Elevator*, 30 Fed. Cl. at 693 ("As a general matter, the [g]overnment remains bound only by the words or actions of those possessed with authority to bind the [g]overnment.").

Here, similarly to Baistar's implied-in-fact contract claim, Baistar fails to sufficiently allege a constructive change because the changes were not ordered by any government agent with actual authority. Even assuming that Baistar performed services outside the scope of the contract at the request of the contracting officer's representatives, Baistar's claim fails. Baistar only received direction from the contracting officer's representatives, and the terms of the contract gave the contracting officer exclusive authority to order out-of-scope services.

3. *The express contract theory.*

Baistar alleges that there is indisputably a valid contract, but it also concedes that the services at issue were outside the scope of the governing contract. *See* Pl.'s Opp'n at 2-3, 11. Because the out-of-scope services were not covered by the ground maintenance contract, they therefore must satisfy all the necessary elements of a new contract, including approval from a government agent with authority to bind the government. *See Vargas*, 114 Fed. Cl. at 233. Because no authority existed here, Baistar's direct breach of contract theory also fails.

For these reasons, the government's motion to dismiss plaintiff's complaint is granted with respect to the hiking trail services claimed in Count I, as well as all services for which claims are made in Counts III and IV.

D. *Count V: Baistar May Be Entitled to Recover for Snow Removal Services Provided Outside the Scope of the Contract as Well as Disputed Salt Charges If It Can Show That the Emergency Exception Applies*

1. *Out-of-scope snow removal.*

13

Baistar justifies its request for equitable relief regarding alleged out-of-scope snow removal services, based upon implied-in-fact contract, constructive change, and direct breach of contract theories.  *See* Pl.'s Opp'n at 9-13.[6]  Additionally, Baistar alleges a breach of the implied duty of good faith and fair dealing.  *See id.* at 12-13.  Here also, the government contends that no breach of contract or constructive change occurred because Baistar was not directed to perform the work by any government agent with authority to bind the government.  *See* Def.'s Reply at 8-9.

Baistar does not allege that any government agent with actual authority ordered the snow removal services.  Baistar received directions from the contracting officer's representatives, not the contracting officer.  Even so, under the ground maintenance contract, the alleged out-of-scope snow removal services have a different potential basis for relief than do the out-of-contract services alleged in Counts I, III, and IV.  Snow and ice on the premises presented a potentially dangerous and imminent threat to the safety of the Retirement Home residents.  Baistar received instructions from the contracting officer's representatives to act quickly, it considered snow removal to be a high priority, and it complied with the directives it received.  *See* Compl. Ex. 70; Hr'g Tr. 27:12-14 (Aug. 18, 2016).

The potentially urgent nature of snow removal is relevant to Baistar's claim because it can trigger a potential exception to the requirement that a government agent possess actual authority.  In limited circumstances, a government agent who lacks contracting authority may nonetheless have authority to bind the government in emergency situations.  *See Philadelphia Suburban Corp. v. United States*, 217 Ct. Cl. 705, 707 (1978) (denying defendant's motion for summary judgment because the government officials ordering the work at issue, though not designated contracting officers, may have had "inherent or implied" authority in "emergency firefighting situations" to procure supplies needed for the emergency); *see also Halvorson v. United States*, 126 F. Supp. 898, 901 (E.D. Wash. 1954) ("Whether or not the [government agents] had authority to bind the government by express contract, or to modify the written contract by oral agreement, they did, in the emergency situation created by the damage done by the blizzard, have authority to direct the contractors to proceed at once to minimize the damage by immediate remedial action."); *Appeals of Sigma Const. Co.*, ASBCA Nos. 37040, 37041, 37042, 91-2 BCA ¶ 23,926 (finding that a contract administrator had implied authority to issue orders related to concrete services because the concrete was drying and there was insufficient time to consult the contracting officer).

The emergency exception to the actual authority requirement is limited and has been construed narrowly.  For example, the Third Circuit refused to apply the exception to a contractor's claim for services provided after a hurricane, on the grounds that the contractor continued providing services for ten weeks.  *See Gardiner v. Virgin Islands Water & Power Auth.*, 145 F.3d 635, 644-46 (3d Cir. 1998).  In *Gardiner*, the court noted, however, that it would

---

[6]The government does not concede that such services were outside the scope of the contract.  *See* Def.'s Mot. at 23, n.13.  However, in construing factual allegations in the light most favorable to the non-moving party at this point in the proceedings, the court assumes that Baistar did provide snow removal services outside the snow removal areas contemplated in the contract.

have considered the plaintiff's claim "in a different light" had the "case concerned only emergency services provided in the first hours or days after the hurricane." *Id.* at 646.  In *City of El Centro*, the Federal Circuit refused to apply the exception when an Immigration and Naturalization Service ("INS") agent told a hospital to provide emergency care to illegal aliens under the custody of the INS.  922 F.2d at 821.  The agent, who lacked the authority to bind the government in ordinary circumstances, could not invoke the emergency exception because the INS was not responsible for any care-providing functions, the hospital was preparing to help the injured aliens anyway, and "the only question was payment." *Id.*  Therefore, the government was not bound to any contract with the hospital. *Id.*  In distinguishing the case from *Halvorson*, the court in *City of El Centro* acknowledged that the situation was "not one in which emergency action must be taken by government agents to protect life and property, and an implied authority to obligate government resources is found." *Id.* (citing *Halvorson*, 126 F. Supp. at 898).

The ground maintenance contract itself sets out a type of emergency exception to the contracting-officer-approval requirement.  DTAR § 1052.201-70(b), incorporated in the contract, states that "[p]erformance of work under this contract must be subject to the technical direction of the C[ontracting ]O[fficer' ]T[echnical ]R[epresentative." Def.'s App. A16.  Then, Subsection (e) of DTAR § 1052.201-70 specifies that

> [*t*]*he contractor shall proceed promptly with performance resulting from the technical direction issued by the* [*technical representative*].  If, in the opinion of the contractor, any direction of the [technical representative], or his/her designee, falls within the limitations in [Subsection](c) [relating to out-of-scope work], the contractor shall immediately notify the contracting officer no later than the beginning of the next [g]overnment work day.

Def.'s App. A16 (emphasis added).  A direction by the technical representative falling within this Subsection arguably is excepted from the contracting-officer-approval requirement by Paragraph 28 of the contract's Performance Work Statement, which states:

> 28.  **Non-Payment for Additional Work.**  Any additional services or a change to work specified which may be performed by the contractor, either at its own volition or at the request of an individual other than a duly appointed C[ontracting ]O[fficer], *except as may be explicitly authorized in the contract*, will be done at the financial risk of the contractor.

Def.'s App. A46 (emphasis added).

As a result, the government's motion to dismiss plaintiff's complaint or, alternatively, for summary judgment, is denied with respect to the out-of-scope snow removal services alleged in Count V.[7]

---

[7]Although Baistar also alleges that it received out-of-scope technical direction regarding the hiking trail in Counts I and III, the emergency exception does not apply to the hiking trail. Those services were not urgent and Baistar spent several weeks or more performing the work.

*2.  Disputed salt charges.*

Baistar seeks an equitable adjustment under Count V for certain disputed invoices and salt services that the Retirement Home refused to pay.  Although Baistar also alleges a breach of implied-in-fact contract under this count, the direct breach of contract allegation is the only relevant theory here because the invoices and salt services fall within the express provisions of the governing contract.  *See Trauma Serv. Grp.*, 104 F.3d at 1326 ("[A]n implied-in-fact contract cannot exist if an express contract already covers the same subject matter.") (citing *Atlas Corp.*, 895 F.2d at 754-55); *see also Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 1255 (Ct. Cl. 1970) ("[A]s a general rule there can be no implied contract where there is an express contract between the parties covering the same subject.").

When interpreting a contract, the court begins by examining the language of the written agreement.  *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003).  "[I]f the provisions are clear and unambiguous, they must be given their plain and ordinary meaning." *Bell/Heery*, 739 F.3d at 1331 (quoting *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996)).  Additionally, the contract must "be construed as a whole and 'in a manner that gives meaning to all of its provisions and makes sense.'"  *Id.* (quoting *McAbee Constr.*, 97 F.3d at 1435).

The salt charges were related to Baistar's snow removal services and thus arguably fall within the emergency exception for snow removal discussed *supra*.  To the extent they do not, however, the contract set forth the procedure to be applied in the event of a disputed invoice or service.  When a dispute arose, the contract required Baistar to "immediately notify the contracting officer no later than the beginning of the next [g]overnment work day."  Def.'s App. A16 (incorporating DTAR § 1052.201-70(e), quoted more fully *supra*).  When Baistar's invoices for salt charges were submitted and not paid, Baistar apparently revised the invoices and accepted the reduced payments.  In the record as it now exists, disputed issues of fact bar granting a motion for failure to state a claim or a motion for summary judgment.  The government's motion accordingly is denied respecting the salt charges.

E.  *Count VIII: Baistar is Not Entitled to Recover for Certain Services the Retirement Home Did Not Order*

Under Count VIII, Baistar seeks an equitable adjustment for certain services that Baistar never performed and the government never ordered, but allegedly should have ordered.  Baistar's claim in this regard is foreclosed by the contract's express provisions.  The contract did not require the Retirement Home to order a minimum amount of the services referenced by Baistar in Count VIII.  Instead, the contract required Baistar to provide certain services if the Retirement Home requested or needed them, and set a price Baistar would be paid in the event that the Retirement Home did in fact order those services.  *See* Def.'s Mot. at 19-23.  That the Retirement Home chose not to order those services was consistent with the contract, and therefore Baistar

---

Compl. ¶¶ 80-82, 100-01; *see Gardiner*, 145 F.3d at 644-46.  The exception also does not apply to the historic canal services as alleged in Count IV for the same reason.

cannot state a viable claim for those services on the basis of the express contract.  The question then arises whether Baistar has stated a claim for relief based on the implied duty of good faith and fair dealing.

    *1.   Implied duty of good faith and fair dealing.*

As part of its direct breach of contract claim, Baistar alleges that the Retirement Home breached the implied duty of good faith and fair dealing under Count VIII.  *See* Pl.'s Opp'n at 12-13.  In response, the government argues that no breach occurred because the Retirement Home acted within the scope of the contract, and the implied duty of good faith and fair dealing cannot create duties that are inconsistent with the express terms of the contract.  *See* Def.'s Reply at 14-16.

Every contract, including a government contract, "imposes upon each party a duty of good faith and fair dealing in its performance and enforcement."  *Metcalf Const. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting *Restatement (Second) of Contracts* § 205 (1981)).  This implied duty applies to both parties to the contract, and it includes "the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  *Centex Corp. v. United States,* 395 F.3d 1283, 1304 (Fed. Cir. 2005).

Proving a breach of the implied duty of good faith and fair dealing is often difficult because of the presumption that government employees perform their duties in good faith.  *See Bannum, Inc. v. United States*, 80 Fed. Cl. 239, 246 (2008) (citing *Southern Cal. Edison*, 58 Fed. Cl. at 325; John W. Whelan, *Understanding Federal Government Contracts* 68-70 (1993)); *see also Torncello v. United States*, 681 F.2d 756, 770 (Ct. Cl. 1982) ("[T]he government, unlike private parties, is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary.").  To overcome this presumption and state a plausible claim, a plaintiff must allege facts that, if proven, constitute a specific intent to injure on the part of the government.  *Southern Cal. Edison*, 58 Fed. Cl. at 325; *see also Dotcom Associates I, LLC v. United States*, 112 Fed. Cl. 594, 596 (2013) ("[A] party generally must allege some kind of 'subterfuge[ ]' or 'evasion[ ],' such as 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance.'") (quoting *Restatement (Second) of Contracts* § 205).

Although proving a breach of the implied duty of good faith and fair dealing is difficult, a plaintiff is not required to identify a violation of an express contract provision.  *See, e.g., Metcalf Const.*, 742 F.3d at 994 (rejecting the government's argument that it did not breach the implied duty simply because the plaintiff could not identify a specific contract term that the government violated).  Rather than deriving solely from the express terms, the implied duty is based upon the parties' reasonable expectations of the contract.  *See id.* at 991; *Mansoor Int'l Dev. Servs., Inc. v. United States*, 121 Fed. Cl. 1, 6 (2015) ("The implied duty stems from the consensual terms reflected in an express contract, but it addresses the parties' reasonable expectations that may not have been embodied in explicit contractual language.").

Because the implied duty of good and fair dealing is premised upon protecting reasonable expectations, any particular obligations imposed by the duty will be limited by the governing contract. *See Metcalf Const.*, 742 F.3d at 994; *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010). More specifically, the implied duty "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine & Timber*, 596 F.3d at 831; *see also Metcalf Const.*, 742 F.3d at 990-91 ("[A]n act will not be found to violate the duty . . . if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision.").

The Retirement Home acted within the scope of the contract when it failed to order certain services because it had no contractual obligation to order the services alleged by Baistar. Baistar's bare assertions of wrongdoing, without sufficient detail or support, are insufficient to overcome the government's presumption of good faith. Although the Retirement Home's actions may have undermined Baistar's expectations, that alone cannot establish a breach of the implied duty. The expectations of the parties must be reasonable, and those reasonable expectations stem from the terms of the contract. The contract explicitly indicated that the Retirement Home would not be required to order a minimum amount of the services alleged in Count VIII. Therefore, Baistar could not have reasonably expected otherwise. In Count VIII, Baistar has failed to state a claim upon which relief can be granted.

F. *Count VI: Dismissal of the Equipment Storage Dispute Is Not Appropriate Because There Is a Genuine Ambiguity in the Contract*

Baistar and the government point to differing contract provisions with regard to whether the contract authorized Baistar to store its equipment on the Retirement Home premises.[8] When giving the express terms of the contract their plain meaning and examining the contract as a whole, it is evident that the pertinent provisions are susceptible to different reasonable interpretations. An ambiguity exists "[w]hen a contract is susceptible to more than one reasonable interpretation." *Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747, 751 (Fed. Cir. 1999) (citing *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed. Cir. 1992)). When a contractor and the government interpret a contract differently, the contractor's interpretation need not be the only reasonable interpretation or "even the best one;" it need only fall within a "zone of reasonableness." *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1368-69 (Fed. Cir. 2009) (citations omitted).

Course of performance can become instructive when the contract terms are ambiguous. *See United States v. Ford Motor Co.*, 463 F.3d 1267, 1278-79 (Fed. Cir. 2006); *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 749 (2005); *see also Jansen v. United States*, 344 F.2d 363, 369

---

[8]A contract provision authorized Baistar "to store [s]alt, [s]and, and other snow removal and [i]ce treatment materials in a designated area determined by [the Retirement Home]." Def.'s App. A40 (Performance Work Statement) ¶ 4.8.3.1. Another provision stated that "[t]he Government will not provide facilities and the [c]ontractor shall not place, construct, or otherwise provide additional buildings or facilities at the [Retirement Home] without prior written approval." Def.'s App. A42 (Performance Work Statement) ¶ 13.

(Ct. Cl. 1965) ("It is a canon of construction that the interpretation placed by the parties upon a contract during its performance is demonstrative of their intention."). In that respect, the *Restatement (Second) of Contracts* § 220 provides:

### § 220.  Usage Relevant to Interpretation

(1) An agreement is interpreted in accordance with a relevant usage if each party knew or had reason to know of the usage and neither party knew or had reason to know that the meaning attached by the other was inconsistent with the usage.

(2) When the meaning attached by one party accorded with a relevant usage and the other knew or had reason to know of the usage, the other is treated as having known or had reason to know the meaning attached by the first party.

As the commentary to this Section of the *Restatement* explains, "[u]sage may 'give particular meaning to' an agreement." *Restatement (Second) of Contracts* § 220 cmt. a.

Baistar claims that a usage relevant to interpretation was established during the initial years the contract was in effect. Specifically, Baistar alleges that from the beginning of its performance, December 16, 2011, until October 16, 2014, Baistar used a staging area known as the "Salt Dome" to store contract performance equipment and items overnight, with full approval of the contracting officer's representatives. Compl. ¶¶ 156-57. This area "contained salt that belonged to Baistar and was generally secured and not accessed by [g]overnment personnel." Compl. ¶ 157. That usage allegedly was halted in October 2014. Compl. ¶ 157. The government has not controverted this course of conduct in Baistar's performance of the contract during its initial years. *See* Answer ¶¶ 156-57. This usage under the contract supports Baistar's interpretation of the pertinent contractual provisions. *See Haddon Hous. Assocs., LLC v. United States,* 92 Fed. Cl. 8, 19-20 (2010) (denying summary judgment due to a factual dispute as to "whether or not the parties established a pattern of conduct that pragmatically interpreted and applied" the contractual provision at issue).

Additionally, when there is an ambiguity in a contract drafted by the government, and the contractor actually and reasonably construes relevant provisions during bidding or performance, the contractor's interpretation will generally be adopted unless the parties' intentions indicate otherwise. *See States Roofing Corp.*, 587 F.3d at 1368-69 (citing *WPC Enterprises, Inc. v. United States,* 323 F.2d 874, 877-78 (Ct. Cl. 1963)). This doctrine of *contra proferentem* is considered a "rule of last resort" that should only be applied when a "genuine ambiguity" exists. *See Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1352-53 (Fed. Cir. 2006).[9]

---

[9]An exception to the general *contra proferentem* rule arises when the ambiguity in the contract is patent, which occurs when the ambiguity is "so glaring as to raise a duty to inquire." *Metric Constructors*, 169 F.3d at 751 (quoting *Newsom v. United States*, 676 F.2d 647, 650 (Ct. Cl. 1982)). If a contractor fails to inquire or seek clarification regarding a patent ambiguity, the discrepancy will be construed against the contractor. *Brezina Const. Co. v. United States,* 449

Application of the doctrine of *contra proferentem* also supports Baistar's position regarding the ambiguous contractual provisions.

In sum, whether Baistar was permitted to store its equipment on-site under the terms of the contract remains in dispute and is potentially affected by factual proof as to usage. The government's motion to dismiss plaintiff's complaint or, alternatively, for summary judgment, is denied with respect to the equipment storage dispute alleged in Count VI.

### G. Count VII: Baistar May be Entitled to Recover for the Retirement Home's Termination of the Contract if Baistar Can Show that the Retirement Home Failed to Reasonably Cooperate

Baistar claims that the Fiscal Service improperly terminated the contract, alleging that the termination contravened applicable regulatory provisions, that the Fiscal Service improperly interrupted the cure period through a Stop Work Order, and that the contracting officer failed to exercise independent judgment based on personal knowledge. *See* Pl.'s Opp'n at 14-17. Additionally, Baistar alleges that the Fiscal Service breached its duty of good faith and fair dealing by engaging in an unjustified campaign to replace it as the ground maintenance contractor. *See id.* at 15-16.

In response, the government argues that the termination complied with applicable FAR regulatory provisions, the interruption of the cure period was proper and justified, and the contracting officer was not required to personally inspect the premises before taking action. *See* Def.'s Mot. at 28-34; Def.'s Reply at 16-18. The government also argues that the Fiscal Service did not breach the implied duty of good faith and fair dealing because the termination process complied with the Fiscal Service's rights and obligations under the contract. *See* Def.'s Reply at 15-16.

A contracting officer has broad discretion to terminate a contract for default, *Consolidated Indus., Inc. v. United States*, 195 F.3d 1341, 1343 (Fed. Cir. 1999), but a termination for default is considered a "drastic sanction" that must be based on "good grounds and on solid evidence." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting *J.D. Hedin Constr. Co. v. United States,* 408 F.2d 424, 431 (Ct. Cl. 1969)). When a plaintiff challenges the validity of a termination for default, "[t]he government bears the burden of proof in establishing the validity of [that] termination." *Johnson Mgmt. Grp. CFC, Inc. v. Martinez,* 308 F.3d 1245, 1249 (Fed. Cir. 2002).

Additionally, the implied duty of good faith and fair dealing includes a duty to cooperate and a duty not to hinder the other party's performance. *Precision Pine,* 596 F.3d at 820 n.1; *D'Andrea Bros. LLC v. United States*, 109 Fed. Cl. 243, 255, *aff'd*, 547 Fed. Appx. 993 (Fed. Cir. 2013). The court applies a reasonableness standard in assessing whether a party breached its duty to cooperate, which requires a factual inquiry that depends upon "the particular contract, its

---

F.2d 372, 375 (Ct. Cl. 1971) (citations omitted). Baistar alleges that it made the appropriate query when it first visited the site before it made its contract proposal. Compl. ¶ 156.

context, and its surrounding circumstances." *Axion Corp. v. United States*, 75 Fed. Cl. 99, 121 (2007) (quoting *Tecom*, 66 Fed. Cl. at 770).  Failure to reasonably cooperate can constitute a breach of contract that excuses the other party's failure to perform.  *See Malone v. United States,* 849 F.2d 1441, 1445 (Fed. Cir.), *modified,* 857 F.2d 787 (Fed. Cir. 1988).

When a contractor encounters problems during the course of performance and requests assistance or clarification, the government's failure to adequately respond can result in a breach of the duty to cooperate.  *See Malone*, 849 F.2d at 1445-46 (holding that the government breached its implied duty by evading questions regarding adequacy of work, misleading the contractor, and refusing to answer certain questions); *Northrop Grumman Corp. v. United States,* 47 Fed. Cl. 20, 78 (2000) (discussing cases where the government breached its duty to cooperate after failing to "provide assistance at the request of a contractor") (citations omitted).  On the other hand, directing a contractor "to perform in accordance with the terms of the contract" will not expose the government to liability.  *Id.* at 78 (quoting *Lathan Co. v. United States*, 20 Cl. Ct. 122, 128 (1990)).  Resolution through summary judgment will not be appropriate when there is a disputed material issue of fact as to whether the government reasonably cooperated.  *See Vanguard Constr., Inc. v. United States*, 123 Fed. Cl. 130, 132-33 (2015); *Axion Corp.*, 75 Fed. Cl. at 121-22.

Here, numerous issues of material fact remain in dispute.  The government argues that the termination provisions under FAR § 52.212-4(m) apply, whereas Baistar argues that the provisions under FAR Part 49 appertain because the Fiscal Service's Cure Notice referenced Part 49 and Baistar allegedly relied on that reference.[10]  Additionally, a factual dispute arises with respect to whether Baistar adequately asked for the Fiscal Service's assistance after receiving the Cure Notice.  It is undisputed that Baistar responded to the Fiscal Service's 2015 Cure Notice with a detailed letter requesting clarification and that the Fiscal Service never responded to Baistar's letter.  However, the adequacy of Baistar's letter remains contested.[11]

Because there is a material factual dispute as to whether the Fiscal Service reasonably cooperated with Baistar's requests for clarification, resolution is not appropriate at this stage of the proceedings.  Therefore, the government's motion to dismiss plaintiff's complaint or, alternatively, for summary judgment, is denied with respect to Count VII.

---

[10]If Part 49 does apply, there is also a dispute as to which subsection of Section 49.402-3 would apply.  *See* Def.'s Mot. at 32-33, n.13.

[11]The government argues that many of Baistar's questions were not related to the Cure Notice and that Baistar failed to demonstrate a plan for curing the deficiencies.  *See* Def.'s Mot. at 30-31 (citing several general questions raised by Baistar including "Why is Baistar to blame for all the decades of mismanage[ment] and abandonment of all buildings and grounds responsibilities?") (quoting Def.'s App. A74).  Baistar responds that it provided detailed information about, and requested necessary and specific clarifications regarding, supposed deficiencies that the Retirement Home only asserted generally.  Pl.'s Opp'n at 15-16.  As a simplistic example, Baistar stated: "Please clarify which areas are infested with weeds; Baistar will take care of it within one day."  Pl.'s Opp'n at 16 (quoting Def.'s App. A77).

**CONCLUSION**

For the reasons stated above, the court requests a more definitive statement from Baistar, pursuant to RCFC 12(e), regarding Baistar's boiler plant services alleged in Count I. Additionally, the government's motion to dismiss plaintiff's complaint or, alternatively, for summary judgment, pursuant to RCFC 12(b)(6) and 56, is GRANTED with respect to the hiking trail services alleged in Count I and as to Counts II, III, IV, and VIII.  The government's motion to dismiss plaintiff's complaint or, alternatively, for summary judgment, is DENIED with respect to the snow removal services and salt disputes alleged in Count V, the equipment storage claim in Count VI, and the improper termination claim of Count VII.  Baistar is requested to file an amended complaint providing a more definite statement of its claims under Count I by October 14, 2016.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge